## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| **ALLISON NAZINITSKY,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CV-19-043-R** |
| | ) | |
| **INTEGRIS BAPTIST MEDICAL** | ) | |
| **CENTER, INC., d/b/a NAZIH ZUHDI** | ) | |
| **TRANSPLANT INSTITUTE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Before the Court is the Motion for Summary Judgment, Doc. No. 29, filed by

Defendant Integris Baptist Medical Center ("Integris") pursuant to Federal Rule of Civil

Procedure 56 and Local Civil Rule 56.1. Plaintiff Dr. Nazinitsky has responded, Doc. No.

39, and Defendant has replied, Doc. No. 46. Upon review of the parties' submissions, the

Court grants Defendant's motion.

## I.     Background

Dr. Nazinitsky filed this action alleging that Integris discriminated against her

because of her sex, in violation of the Equal Pay Act, 29 U.S.C. § 206(d) and Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Doc. No. 1. Specifically, Dr. Nazinitsky

alleges that she experienced wage discrimination, a hostile work environment, retaliation,

and finally that she was constructively discharged from her position as an infectious disease

specialist. *Id.* The circumstances surrounding Dr. Nazinitsky's hiring are largely

undisputed; the facts related to her departure, and the events leading thereto, however, are contested by the parties.

In 2015, following her graduation from medical school and the completion of her residency and fellowship programs, Dr. Nazinitsky applied for a position with Integris as a full-time transplant infectious disease specialist. Doc. Nos. 29, 39, ¶¶ 4, 7. Having never hired a physician to fill that role, Integris's Vice President, Ms. Calbone, engaged Navigant, a specialized independent consulting firm, to assess the fair market value of the employment agreement and related compensation for Dr. Nazinitsky. *Id.* at ¶¶ 3, 9. Navigant reviewed compensation plan methodologies and schedules, communicated with Integris administration to discuss the nature of the role, and consulted specialty-specific data from several compensation production surveys. *Id.* at ¶ 11. On April 16, 2015, Ms. Calbone received an opinion letter from Navigant summarizing their findings. *Id.* at ¶ 10. Both parties agree that Navigant did not reference Dr. Nazinitsky's sex in making any compensation recommendations. *Id.* at ¶ 14.

Thereafter, and in consideration of Navigant's opinion letter, Integris offered Dr. Nazinitsky a two-year contract, *id.* at ¶ 19, with a base salary of $225,000.00, Doc. Nos. 39, 46, ¶¶ 12, 19. Her compensation package also included $25,000.00 for a medical directorship and $25,000.00 in bonus pay, bringing her total compensation to $275,000.00 per year. *Id.* She accepted the job and began her employment with Integris on July 31, 2015. Doc. Nos. 29, 39, ¶ 18. The male doctors that Dr. Nazinitsky compares herself to had been employed by Integris for a number of years and had varying compensation rates, all higher than Dr. Nazinitsky's. In 2016, Dr. Crespo, a physician specializing in family

medicine as a Hospitalist, had been employed by Integris for four years as a specialist and for ten years prior as a physician; he had a base salary of $301,998.32 and a total salary of $372,997.84. Doc. No. 41. Dr. El-Amm, a physician specializing in Nephrology, had been employed by Integris for seven years; he had a base salary of $450,000.20 and a total salary of $558,000.28. *Id.* Finally, Dr. Horstmanshof, a physician specializing in cardiology, had been employed by Integris for ten years; he had a base salary of $658,080.20 and a total salary of $740,880.20. *Id.*

About three months before Dr. Nazinitsky's contract was to expire, Integris received three anonymous complaints concerning Dr. Nazinitsky, through its Integrity Line. The first complaint alleged that she was creating a hostile work environment and was using profanity when speaking to staff and in front of patients. Doc. No. 29-9. The second complaint alleged that she was acting in a disrespectful and unprofessional manner and was using profanity when communicating with staff. Doc. No. 29-10. The third complaint alleged that she was not speaking professionally to staff. Doc. No. 29-11.

On May 17, 2017, Ms. Calbone and President of Integris, Tim Johnsen, met with Dr. Nazinitsky to discuss the three complaints, as they would with any physician or staff member accused of misconduct, regardless of their sex. Doc. Nos. 29, 39, ¶ 31. Dr. Nazinitsky denied the allegations. *Id.* at ¶ 28. At the close of the meeting, she was asked to sign a memo summarizing the purpose of the meeting. *Id.* at ¶ 30. The memo stated, in part: "If any of these alleged incidents/events are true, immediate and continued improvement must be noted or further disciplinary action, up to and including termination or non-renewal of her contract, and/or presentation to the Medical Staff Officers for

3

investigation of disruptive behavior will continue." *Id.* at ¶ 29. Dr. Nazinitsky refused to sign the memo. *Id.* at ¶ 30. Even so, according to Integris, there were no plans to terminate or not renew Dr. Nazinitsky's contract once it expired on July 30, 2017. Doc. No. 29, ¶ 33. According to Dr. Nazinitsky, however, while no one at Integris said that they would not renew her contract, Doc. No. 31, p. 130:14-24, she was threatened with termination and nonrenewal of her contract, Doc. No. 39, ¶ 33.

The next day, on May 18, 2017, Dr. Nazinitsky sent Integris a letter stating that she would not be renewing her contract once it expired on July 30, 2017. Doc. Nos. 29, 39 at ¶ 32. Nevertheless, she continued to work and provide quality medical care until the end of her contract. *Id.* at ¶ 35. During that time, her salary was left unaltered. Doc. No. 29, ¶ 36; Doc. No. 31, p. 143:5–18. Integris also claims that during Dr. Nazinitsky's final two months of employment, her working responsibilities and conditions remained unchanged. Doc. No. 29, ¶ 35. Dr. Nazinitsky denies this fact; she claims that during her two years of employment with Integris, she was denied administrative staff, forced to come in on her days off, forced to work weekends, and ultimately that she worked more than some male physicians but got paid less. Doc. No. 39, ¶ 35. She also claims that she was denied two months of cell-phone reimbursements and two weeks of her medical director pay. *Id.* at ¶ ¶ 36, 47.

On January 15, 2019, Dr. Nazinitsky filed this action, alleging that the circumstances described above resulted from Integris's discrimination, in violation of the Equal Pay Act and Title VII of the Civil Rights Act of 1964. Doc. No. 39. Integris now moves for summary judgment. Doc. No. 29.

## II.     Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks and citation omitted). In assessing whether summary judgment is appropriate, the Court views the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Williams v. FedEx Corp. Services*, 849 F.3d 889, 896 (10th Cir. 2017).

## III.    Equal Pay Act

The Equal Pay Act (EPA) prohibits wage discrimination "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *see also Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015). Dr. Nazinitsky claims that Integris participated in wage discrimination, paying her less than her male comparators on the basis of sex.

To establish a prima facie case of wage discrimination under the EPA, a plaintiff must demonstrate that: "(1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same;

[and] (3) the male employees were paid more under such circumstances." *Riser*, 776 F.3d at 1196 (citation omitted). In its Motion for Summary Judgment, Integris does not dispute the second or third element; it simply argues that Dr. Nazinitsky has failed to satisfy the first element, that her work was "substantially equal" to the work of her male comparators.

Work is "substantially equal" for purposes of the EPA if it requires "equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). A court must analyze the tasks actually performed by the employees to determine whether they performed work requiring equal skill, effort, and responsibility. *See* 29 C.F.R. § 1620.14(c) (1986). Therefore, a Court's "determination turns on the actual content of the job—not mere job descriptions or titles." *Riser*, 776 F.3d at 1196 (citation omitted). "Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." *Id.* Jobs that are merely alike or comparable are not "substantially equal" for purposes of the EPA. *Id.* In determining whether two positions require "substantially equal" work, a court must ultimately "make a practical judgment based on all the facts and circumstances of the case . . . . As a result, summary judgment on this issue often will be inappropriate." *Casalina v. Moniz*, No. CV 13-535 KG/WPL, 2016 WL 7486190, at *5 (D.N.M. Oct. 27, 2016), *aff'd sub nom. Casalina v. Perry*, 708 F. App'x 938 (10th Cir. 2017); *see also* 29 C.F.R. § 1620.14(a).

Integris contends that Dr. Nazinitsky's work is not substantially equal to her alleged male comparators—Dr. Horstmanshof, Dr. El-Amm, and Dr. Crespo—because she had a different specialty than they did, she was not a primary provider for her patients as they

were, and each doctor had different job duties.[1] Doc. No. 29, p. 26. Dr. Nazinitsky responds, asserting that, like her male comparators, she evaluated and treated patients pre-transplant, peri-transplant, and post-transplant; gathered patient history; performed physical exams; ordered diagnostics; interpreted diagnostics; made diagnoses; and ordered procedures and treatment modalities to treat and manage patients. Doc. No. 39, p. 21.

Based upon the parties' arguments, the Court assumes without deciding that Dr. Nazinitsky has met her burden to establish that she was performing work which was substantially equal to that of her male comparators.

Once a plaintiff has established a prima facie case of discrimination under the EPA, the defendant must show the wage disparity was justified by one of four permissible reasons: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *see also Riser*, 776 F.3d at 1198. To meet this burden, an employer must "submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons could explain the wage disparity, but that the proffered reasons do in fact explain the wage disparity." *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006) (citation omitted). At the summary judgment stage,

---

[1] Integris also contends that Dr. Nazinitsky and her male comparators had different backgrounds, levels of experience, medical expertise, and knowledge. This argument is misplaced. Although the Tenth Circuit has not spoken to the precise issue, other circuits have held that "a plaintiff establishes a prima facie case by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir.1992) (citation omitted). Because the comparison at the prima facie stage is of the jobs and not the employees, "only the skills and qualifications actually needed to perform the jobs are considered." *Id.* "Factors like education and experience are considered as a defense to an employer's liability rather than as part of a plaintiff's prima facie case." *Beck-Wilson v. Principi*, 441 F.3d 353, 362–63 (6th Cir. 2006) (citations omitted).

this means a defendant-employer must "prove at least one affirmative defense so clearly that no rational jury could find to the contrary." *Id.* at 1311 (citation omitted). The plaintiff may rebut the defendant's EPA defense by showing pretext. *Casalina v. Perry*, 708 F. App'x 938, 941 (10th Cir. 2017).

In 2016, Integris paid Dr. Nazinitsky an annual base salary of $225,000.00, Dr. Crespo $301,998.32, Dr. El-Amm $450,000.20, and Dr. Horstmanshof $658,080.20. Doc. No. 41.[2] Integris asserts that this wage disparity was based on two factors other than sex: (1) a bona fide, gender-neutral pay classification system based on marketplace value, and (2) employee experience. Doc. No. 29, p. 26–27. In response, Dr. Nazinitsky alleges that her pay, in comparison to that of her male comparators, was disproportionate when each doctors' relative value unit (RVU) production is considered. Doc. No. 39, p. 23–24. She also alleges that her experience had no bearing on her compensation rate and thus cannot be used as an affirmative defense. *Id.* Upon review, the Court finds that the record supports Integris's affirmative defense and that no rational jury could find otherwise.

As to Integris's first justification, the Tenth Circuit has held that a bona-fide, gender-neutral pay classification system is a factor other than sex for purposes of the EPA so long as "any resulting difference in pay is rooted in legitimate business-related differences in work responsibilities and qualifications for the particular positions at issue." *Riser*, 776 F.3d at 1198. Other courts have more specifically determined that marketplace value is itself a factor other than sex for purposes of the EPA. *See Varley v. Superior Chevrolet*

---

[2] In accordance with the parties' briefing, the Court addresses the wage-discrimination issue considering the doctors' annual base salaries. Dr. Nazinitsky does not argue that Integris discriminated against her when setting bonus and incentive pay.

*Auto. Co.*, No. CIV 96-2119-EEO, 1997 WL 161942, at *11 (D. Kan. Mar. 21, 1997) (listing cases); *see also Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir. 1980).

Dr. Nazinitsky concedes that Integris's "[c]ompensation of physicians is based primarily on the particular medical specialty in which a physician is educated, trained, [and] licensed . . . ." Doc. No. 39, ¶ 15. She also concedes that her compensation rate was within a fair market range. *Id.* at 23. What's more, she does not dispute the evidence provided by Integris indicating that Dr. Horstmanshof's specialty, cardiology, and Dr. El-Amm's specialty, hospitalist, have higher market value ranges than her specialty, infectious disease. *Id.* at ¶ 17; Doc. No. 29, ¶ 17. Her own evidence demonstrates that Dr. Crespo's specialty, nephrology, also has a higher market value range than her specialty. *See* Doc. No. 42. Drs. Horstmanshof, El-Amm, and Crespo's specialties garner wages 86%, 38%, and 13% higher than Dr. Nazinitsky's specialty, respectively.[3] Evidently, Dr. Nazinitsky is paid less than her male comparators, not due to her sex, but due to her medical specialization. To be sure, the lower market value compensation range associated with her specialty does not, alone, explain the entire wage disparity.[4] But coupled with Integris's second rationale, the Court finds that Integris has proved its affirmative defense such that no rational jury could find to the contrary.

---

[3] This is evidenced by the average difference in each doctors' compensation range, based on their specialties, as reflected in Doc. No. 42.

[4] Based on the Court's own calculations, the difference in marketplace value accounts for approximately 40% of the wage disparity between Dr. Nazinitsky and her male comparators. By the numbers, Dr. Nazinitsky is paid 192% less than Dr. Horstmanshof, 100% less than Dr. El-Amm, and 34% less than Dr. Crespo. Dr. Nazinitsky's specialty, based on average market salary data, as stated above, garners 86% less than Dr. Horstmanshof's specialty, 38% less than Dr. El-Amm's, and 13% less than Dr. Crespo's. Integris's market value justification therefore explains 45% of the difference in pay between Dr. Nazinitsky and Dr. Horstmanshof, 38% between Dr. Nazinitsky and Dr. El-Amm, and 38% between Dr. Nazinitsky and Dr. Crespo.

Integris's second justification for the pay disparity is the difference in experience between Dr. Nazinitsky and her male comparators. The Tenth Circuit has held that "an employee's prior experience is a factor 'other than sex' for purposes of the Equal Pay Act." *Casalina*, 708 F. App'x at 941 (citing *Mickelson*, 460 F.3d at 1312). They have also offered some guidance on what type of evidence satisfies a defendant's burden in this context. In *Mickelson v. New York Life Ins. Co.*, the Circuit noted that sometimes, a male comparator's "experience [can] so far outweigh[] the women's experience that no rational trier of fact could conclude other than that [the male comparator's] experience was the determinative factor in setting his salary." 460 F.3d 1304, 1313 (10th Cir. 2006).

Here, Integris submits evidence demonstrating that Dr. Nazinitsky's employment with Integris was her first job following graduation from medical school and completion of her residency and fellowship programs. Doc. Nos. 29, 39, ¶ 7. The evidence shows that the male doctors, however, had long since completed their educational requirements, and had been employed by Integris for many years. *Id.* at ¶ 16. By 2016, Dr. Horstmanshof had been employed by Integris for about eleven years, Dr. El-Amm for about eight, and Dr. Crespo for about fifteen—though, Dr. Crespo had worked for Integris in his current role for only five years. *Id.* Dr. Long—Medical Director for the Integris Transplant Institute— explained the wage discrepancy by noting that Dr. Nazinitsky's male comparators, as indicated above, "have much greater tenure than her, [that] they were not new to the practice, [and that] they've been in practice for a very long time." Doc. No. 47, pp. 51:18– 52:1. Considering the relative experience of each doctor, in conjunction with the wage disparity between Dr. Nazinitsky and each male comparator, no rational trier of fact could

conclude other than that their experience was a factor in setting their salary. *See Casalina*, 708 F. App'x at 941 (finding that an eleven-year difference in experience satisfied defendant's burden to justify a wage disparity); *see also Mickelson*, 460 F.3d at 1313 (10th Cir. 2006) (finding that an eighteen-year difference in experience would satisfy defendant's burden to justify a wage disparity).

The Court finds that Integris has satisfied its burden to justify the wage disparity by a factor other than sex. Dr. Nazinitsky's specialty placed her in a lower compensation range than her male comparators—creating a wage disparity—and her lack of experience increased that disparity even further. Accordingly, Dr. Nazinitsky bears the burden in rebuttal to show that Integris's two justifications for the wage disparity are merely pretext for sex discrimination. *Casalina*, 708 F. App'x at 941.

In an effort to satisfy this burden, Dr. Nazinitsky contends that Integris's first rationale—the bona-fide fair market value compensation system—is pretextual because, while Integris did set compensation within a fair market range, her compensation was grossly disproportionate to her male comparators when viewed through the lens of relative value units (RVUs).[5] Doc. No. 39, p. 23. Therefore, she suggests that to the extent Integris based compensation rates on work RVUs, the disparity in pay can only be explained by sex discrimination. *Id.* According to the record, however, Integris "does not . . . use RVUs . . .

---

[5] RVUs are a measure of value used in the United States Medicare reimbursement formula for physician services. *See generally* 42 U.S.C. §§ 1395w–4. The dollar amount for each service provided by a physician is determined by three components: physician's work, practice expenses, and malpractice insurance. *See* 42 U.S.C. §§ 1395w–4(c)(2)(A)(i) & (c)(2)(C)(i)-(iii). The component Dr. Nazinitsky contends is relevant here—physician's work—is divided into four subcomponents: time, technical skill or physical effort, mental effort or judgment, and stress. 42 U.S.C. §§ 1395w– 4(c)(2)(L)(ii). Ultimately, each of the three major components is assigned an RVU, added together, and the resulting sum is then multiplied by a dollar amount known as the conversion factor to arrive at the reimbursement dollar figure. *See generally* 42 U.S.C. §§ 1395w–4.

as the primary standard for compensation." Doc. No. 47, pp. 46:22–25 (recording Dr. Long's explanation of Integris's standards for setting compensation). Neither does Navigant—the independent third-party that provided Integris with Dr. Nazinitsky's fair market value compensation rate. *Id.* at p. 47: 1–14. According to Dr. Long, "Navigant gets its data from surveys of the region." *Id.* It does use RVUs, but not to generate compensation rate recommendations for physicians. *Id.* Additionally, Navigant's Confidential Opinion Letter confirms that Integris determined Dr. Nazinitsky's compensation rate by relying primarily on market salary data, not RVUs. *See* Doc. No. 33, p. 8–9, 14.

Dr. Nazinitsky nevertheless continues by arguing that under 26 U.S.C. § 501(c)(3), non-profit hospitals like Integris are required to use RVUs to set compensation, suggesting that Integris's justification is unlikely due to its inconsistency with the requirements of federal law. Doc. No. 39, ¶ 15. But Dr. Nazinitsky fails to direct the Court's attention to any relevant language under § 501(c)(3), and upon a review of that title, the Court finds no RVU requirement. Additionally, the medical compensation surveys cited by Integris contradict Dr. Nazinitsky's assertion. According to the American Medical Group Association, for example, medical groups use a wide variety of inputs to determine base salaries, including, but not limited to: market salary data, prior year salaries, RVUs, net collections, and gross productivity. *See, e.g.*, AMGA 2014 Group Compensation and Financial Survey, p. 15–16 (2014), https://tinyurl.com/uvwynva.

Moreover, while the issue of RVUs and physician compensation is not widely discussed in the federal courts, at least one court has acknowledged the variety of ways medical groups set compensation rates. *See Ahad v. Bd. of Trustees of S. Illinois Univ.*, No.

12

15-CV-3308, 2019 WL 1433753, at *2 (C.D. Ill. Mar. 29, 2019) ("Hiring decisions and compensation recommendations are standardized to some extent but are also based on a number of individualized factors, including, but not limited to, need, salary survey data, the source of funding, and the physician's background and qualifications, as well as market factors."). That Integris relies primarily on market value data, and not on RVUs, to set compensation is not a decision the Court has authority to question. "Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000).

Next, Dr. Nazinitsky argues that Integris's second justification—level of experience—is pretext for discrimination because experience had no role in Integris's setting of physician compensation rates. Doc. No. 39, p. 23–24. However, Former Vice President for Transplants, Advanced Cardiac Care and Research for Integris's Transplant Institute, Mary Calbone—who was involved in setting Dr. Nazinitsky's compensation— indicated that during her time at Integris, work experience was routinely used in determining compensation for physicians. *See* Doc. 32, ¶ 9. Additionally, Navigant explicitly stated in its "Summary Findings and Conclusions" that Dr. Nazinitsky's experience was taken into consideration. *See* Doc. No. 33, p. 11 ("the proposed compensation reflects what comparable organizations would likely be required to pay physicians with similar experience and skills to perform similar duties"). In fact, the medical surveys relied upon by Navigant to determine Dr. Nazinitsky's salary, *see* Doc. No. 33, p. 9, and relied upon by Integris to set physician compensation more generally, *see*

13

Doc. No. 29, ¶ 17, separate fair market value compensation for "New Physicians" and "Experienced Physicians," *see, e.g.*, AMGA 2014 Group Compensation and Financial Survey, at 34–36 (2014), https://tinyurl.com/uvwynva. The survey data also includes inputs based upon a physician's "Years of Experience," *Id.* at 315–16, confirming Integris's justification that experience is considered when setting compensation. Finally, as noted previously, Dr. Long explicitly cited the experience of Dr. Nazinitsky's male comparators as a reason for the wage disparity. Doc. No. 47, 51:18–52:1. In response, Dr. Nazinitsky provides no support to contradict or question any of Integris's evidence, apart from her own conjecture. *See* Doc. No. 39, p. 23–24.

Based upon the evidence provided, when viewed in the light most favorable to Dr. Nazinitsky, a jury would be compelled to find that the reasons proffered by Integris— market value and experience—were, in fact, the reasons for the wage disparity. Furthermore, Dr. Nazinitsky's allegation of pretext is insufficient to create a genuine issue of fact as to whether the pay differential was based on sex. Integris is entitled to summary judgment on Dr. Nazinitsky's EPA claim.

## IV.    Title VII

Pursuant to Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Dr. Nazinitsky claims that Integris violated Title VII by subjecting her to: (1) wage discrimination on the basis of sex; (2) sex discrimination, resulting in her constructive discharge; (3) a hostile work environment on

the basis of sex; and (4) retaliation for opposing Integris's unlawful sex discrimination. Doc. No. 1. Integris argues that it is entitled to summary judgment under each theory.

In evaluating Integris's motion for summary judgment, the Court must follow the analytical framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973). For each theory of discrimination under Title VII, the framework proceeds as follows: The plaintiff-employee must first establish a prima facie case of sex discrimination. *Id.* at 802. If the plaintiff makes such a showing, the burden shifts to the defendant-employer to state a legitimate, "nondiscriminatory reason" for its "adverse employment action." *Wells v. Colo. Dep't of Transp.,* 325 F.3d 1205, 1212 (10th Cir. 2003). If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reason is pretextual. *Jones v. Denver Post Corp.,* 203 F.3d 748, 756 (10th Cir. 2000).

### a.  Wage Discrimination

To establish a prima facie case of wage discrimination under Title VII, a plaintiff must show that she "occupies a job similar to that of higher paid males*." Lewis v. D.R. Horton, Inc.*, 375 F. App'x 818, 825 (10th Cir. 2010).

The Court need not delve into this analysis. Where a plaintiff brings a wage-discrimination action pursuant to both the EPA and Title VII, "[i]f the employer proves one of the EPA affirmative defenses it will also be entitled to judgment on [the] Title VII wage-discrimination claim." *Foco v. Freudenberg-NOK Gen. P'ship*, 549 F. App'x 340, 345 (6th Cir. 2013). Here, Integris has proved one of the EPA affirmative defenses—that

the wage disparity was based on a factor other than sex. Accordingly, Integris is entitled to summary judgment on Dr. Nazinitsky's Title VII wage-discrimination claim.

Even if Integris failed to prove one of the EPA affirmative defenses, the Court would still find that Dr. Nazinitsky's wage-discrimination claim pursuant to Title VII is subject to dismissal. Assuming Dr. Nazinitsky establishes a prima facie case of wage discrimination under Title VII, Integris provides a legitimate, nondiscriminatory reason for its actions: That any wage disparity was based upon a bona fide, gender-neutral, market-value pay classification system, and employee experience. *See Riser*, 776 F.3d at 1200 (finding defendant's proffer of a pay classification system sufficed as a legitimate, nondiscriminatory reason for pay disparity). And in response, Dr. Nazinitsky provides no probative evidence demonstrating that Integris's nondiscriminatory reasons for its actions were merely pretextual.[6]

### b.  Sex Discrimination & Constructive Discharge

To establish a prima facie case of sex discrimination under Title VII, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) "the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 800 (10th Cir. 2007).

---

[6] In fact, Dr. Nazinitsky provides no Title-VII-specific arguments on this issue; she merely references her discussion concerning the EPA. Doc. No. 39, p. 24. While this is not fatal, *see Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1361 (10th Cir. 1997), her arguments under the EPA attempt to demonstrate that Integris failed to meet its burden of persuasion to justify the wage disparity—not, as required under Title VII, that she meets her burden to show pretext. *See Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006) (detailing the different burdens in a Title VII wage-discrimination case as compared to one brought under the EPA).

Integris argues that Dr. Nazinitsky fails to establish element two—that she suffered an adverse employment action. According to the Tenth Circuit, "[a]n adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Tapia v. City of Albuquerque,* 170 F. App'x 529, 533 (10th Cir. 2006) (citations and internal quotation marks omitted). "Although what constitutes an adverse employment action is inherently a fluid and fact-based consideration, a mere inconvenience or an alteration of job responsibilities will not suffice." *Id.* (citations and internal quotation marks omitted).[7]

Dr. Nazinitsky contends that she suffered an adverse employment action when she was called into a meeting with her superiors, Ms. Calbone and Mr. Johnsen, to discuss anonymous complaints filed against her by co-workers, and subsequently asked to sign a warning memo. Doc. No. 39, p. 25–26. She argues that the warning was tantamount to an adverse employment action because it put her employment in an at-risk status. *Id.* Integris argues that as a matter of law, meetings and formal warnings, like those Dr. Nazinitsky describes, do not constitute adverse employment actions. Doc. No. 29, p. 14-15. Integris also argues that Dr. Nazinitsky was not at risk of losing her job based upon the warning memo. *Id.* The Court agrees with Integris; neither the meeting nor the warning constitute an adverse employment action.

---

[7] In *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006), the United States Supreme Court modified the standard for adverse employment actions in the context of a retaliation claim. According to the Tenth Circuit, the Supreme Court's modification "had no similar effect on [the Circuit's] discrimination jurisprudence." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007).

According to the Tenth Circuit, placing an employee on a professional improvement plan or issuing a formal warning does not constitute an adverse employment action unless it puts the employee immediately at risk of termination or affects salary or status. *See Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224–25 (10th Cir. 2006) *abrogated in part on other grounds by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In *Haynes*, the plaintiff—who had failed to meet her sales quota—argued that being placed on a personnel improvement plan constituted an adverse employment action. The Tenth Circuit rejected the plaintiff's argument, holding that placement on such a plan was not adverse because the plaintiff "was not demoted, her pay did not change and her responsibilities were not significantly modified. Instead, she was presented with clear goals to achieve her continued employment." *Haynes*, 456 F.3d at 1225.

Here, the warning presented to Dr. Nazinitsky at the end of the meeting did state that disciplinary action, "up to and including termination" could result. Doc. No. 39-6. But that action would only take place "if the[] alleged incidents/events are true" and thereafter, if no improvement was noted on Dr. Nazinitsky's part. *Id.* The possibility of her termination—or any immediate change in responsibilities—was thus contingent on future developments, rather than being a present plan or decision. Integris even specifies that there were no plans to terminate or not renew Dr. Nazinitsky's contract once it expired on July 30, 2017. Doc. No. 29, ¶ 33. And Dr. Nazinitsky concedes that no one at Integris said they would not renew her contract. Doc. No. 31, p. 130:14-24.

As in *Haynes,* the facts of this case do not demonstrate that the meeting had any immediate effect on Dr. Nazinitsky's employment status. "She was not demoted, her pay

18

did not change and her responsibilities were not significantly modified. Instead, she was presented with clear goals to achieve her continued employment." *Haynes,* 456 F.3d at 1224–25 (citing *Agnew v. BASF Corp.,* 286 F.3d 307, 310 (6th Cir. 2002) for the additional proposition that "the possibility of termination mentioned in the plaintiff's [performance improvement plan] was contingent on future developments, rather than being a present plan or decision and therefore did not constitute an adverse employment action . . . ."); *see also Tapia,* 170 F. App'x at 535 ("The fact that the [disciplinary] letter indicates that Tapia could be disciplined [in the] future . . . is not enough to make the letter itself disciplinary action"); *Rennard v. Woodworker's Supply, Inc.,* 101 F. App'x 296, 307 (10th Cir. 2004) (finding that a "written reprimand [that] expressly stated that plaintiff could be suspended and/or terminated if she failed to comply with the company's sexual harassment policy in the future" was not an adverse employment action because plaintiff "made no showing that the reprimand had any immediate or practical effect on her job status.").

Dr. Nazinitsky's citation to *Roberts v. Roadway Express, Inc.,* 149 F.3d 1098 (10th Cir. 1998) does not alter the Court's conclusion. In *Roberts,* the Tenth Circuit held that a plaintiff's receipt of twenty warning letters constituted an adverse employment action because, under the defendant's policy, the more warnings received by an employee, the more likely he or she was to be terminated. In contrast, Dr. Nazinitsky alleges only one instance of disciplinary action—the meeting with Ms. Calbone and Mr. Johnsen, culminating in the warning memo discussed above. And Integris did not have a policy like the defendant in *Roberts* which placed an employee at risk of termination based upon the amount of warning letters they received. At bottom, the single warning given to Dr.

Nazinitsky is not an adverse employment action for purposes of Title VII. *See Dick v. Phone Directories Co.*, 397 F.3d 1256, 1270 (10th Cir. 2005) (noting that *Roberts*'s finding of an adverse employment action is not relevant where a plaintiff complains of "a single write-up" that does not immediately affect her employment status).

Dr. Nazinitsky argues further that even if the meeting and subsequent warning were not adverse employment actions, Integris committed other acts that were adverse for purposes of Title VII. She claims that due to her sex, Integris deprived her of her own administrative and nursing support, Doc. No. 39, p. 26, and that she was forced to share her male colleagues' administrative and nursing staff, *id.* at ¶ 11. She also contends that Integris failed to reimburse her for two months of cell-phone bills. *Id.* at p. 26. Finally, she claims Integris required her to be on call, did not compensate her for working on weekends, and repeatedly caused her to be refused service by the lab. *Id.*

Integris responds to this argument only in the context of Dr. Nazinitsky's retaliation claim. Doc. No. 46, p. 10. Nevertheless, the actions Plaintiff alleges above do not constitute adverse employment actions. Like the meeting between Dr. Nazinitsky and her superiors, and the subsequent warning memo, these actions did not result in a change in the doctor's employment status: her job, salary, and benefits always remained the same. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) (requiring significant change in employment status for adverse employment action); *see also Tapia*, 170 F. App'x at 534 (finding no adverse employment action where potentially suspect conduct—including employer harassment, following, and monitoring—did not result in a change in plaintiff's employment status).

Alternatively, Dr. Nazinitsky argues that she was constructively discharged, Doc. No. 39, p. 27, Integris objects, arguing that Dr. Nazinitsky's voluntary resignation was not a constructive discharge. Doc. No. 29, p. 15–16. "[C]onstructive discharge is an adverse employment action." *Strickland v. United Parcel Serv.*, 555 F.3d 1224, 1230 n.4 (10th Cir. 2009); *see Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008) ("Even if an employee resigns, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that [she] was constructively discharged."). "A claim of constructive discharge . . . has two basic elements: First that the plaintiff was [unlawfully] discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign . . . . Second, that [she] actually resigned." *Rivero v. Bd. of Regents of Univ. of New Mexico*, 950 F.3d 754, 761 (10th Cir. 2020) (quoting *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016)). "Essentially, a plaintiff must show that she had *no other choice* but to quit. The conditions of employment must be objectively intolerable[.]" *Id.* (citation omitted). "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Id.* (citation omitted).

A few cases demonstrate the type of evidence Dr. Nazinitsky must produce to meet her burden of establishing constructive discharge. For example, in *Acrey v. American Sheep Industry Ass'n*, 981 F.2d 1569, 1574 (10th Cir. 1992), the plaintiff's supervisor asked her to quit on multiple occasions, citing her age and image. Her supervisor also repeatedly confronted her with a litany of performance shortcomings, took away longstanding job responsibilities, and gave the employee inadequate information and training to perform her

new responsibilities. *Id.* "Because the supervisor made it nearly impossible for the plaintiff to continue performing her job, [the Tenth Circuit] concluded she was constructively discharged." *Fischer*, 525 F.3d at 981 (discussing *Acrey*, 981 F.2d at 1574).

With that said, an employee cannot survive summary judgment merely by producing evidence showing that working conditions were difficult or unpleasant. *Id.* (citation omitted). For example, in *EEOC v. PVNF, LLC,* 487 F.3d 790, 794 (10th Cir. 2007), "the EEOC produced evidence demonstrating that the defendant[-employer] repeatedly subjected female employees to sexually explicit and derogatory remarks. Even so, [the Tenth Circuit] concluded the EEOC failed to produce sufficient evidence demonstrating working conditions were so intolerable that a female employee who quit was constructively discharged." *Fischer*, 525 F.3d at 981 (discussing *PVNF*, 487 F.3d at 806).

To that end, "[e]ven some evidence of discriminatory animus in the workplace will not necessarily establish a constructive discharge claim." *Id.*; *see also Bennett v. Quark, Inc.,* 258 F.3d 1220, 1229 (10th Cir.2001), *overruled on other grounds by Boyer v. Cordant Technologies, Inc.,* 316 F.3d 1137, 1140 (10th Cir.2003) ("[A] finding of constructive discharge may not be based solely on a discriminatory act; there must also be aggravating factors that make staying on the job intolerable.") (internal quotation marks omitted)). As these cases demonstrate, "[t]he bar [for a constructive discharge claim] is quite high." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).

Applying these principles here, Dr. Nazinitsky fails to produce sufficient evidence demonstrating that Integris unlawfully discriminated against her, and that even if it did, that her working conditions were so intolerable that a reasonable person in her position

would feel forced to quit.[8] She argues that the meeting with her superiors and the subsequent warning memo is evidence of both discrimination and the intolerable position she was placed in. Doc. No. 39, p. 27 (citing Pl.'s SADMF, ¶¶ 1, 2). However, as discussed above, Integris conducted the meeting because of complaints filed against Dr. Nazinitsky— not for any discriminatory purpose. *See e.g.,* Doc. Nos. 29, 39 ¶ 31 (recording both parties' agreement that employee complaints are addressed by administration regardless of the person's sex). And the warning letter did not threaten Dr. Nazinitsky with an immediate risk of termination. *See e.g.,* Doc. No. 39-6. To the contrary, the evidence demonstrates that there were no plans to terminate Dr. Nazinitsky or to not renew her contract once it expired on July 30, 2017. Doc. No. 29, ¶ 33.

Ultimately, like the defendants' actions in *PVNF* and *Bennet*, Integris's actions did not make it objectively intolerable for Dr. Nazinitsky to work. In fact, both parties represent that even after submitting her resignation letter, Dr. Nazinitsky chose to complete the final two months of her contract and during that time, she provided quality medical care to her patients. Doc. Nos. 29, 39, ¶ 35.

As a matter of law, Dr. Nazinitsky was not constructively discharged. Accordingly, she fails to demonstrate that she suffered an adverse employment action and thereby fails

---

[8] Dr. Nazinitsky cites to *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986), arguing that "[w]hether an objective person in Plaintiff's position would have felt [forced to quit] is a question of fact for the jury." Doc. No. 39, p. 27. *Derr* does not, however, support the doctor's argument. *See Derr*, 796 F.2d at 344. Moreover, the Tenth Circuit cases discussed by the Court above demonstrate that the issue is appropriate for review on summary judgment. *See e.g., Fischer*, 525 F.3d at 981.

to establish a prima facie case of discrimination.[9] Integris is therefore entitled to summary judgment.

### c. Hostile Work Environment

To establish a prima facie case of hostile work environment under Title VII, a plaintiff must demonstrate that: "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on [sex]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (citation omitted)

Integris contends that Dr. Nazinitsky fails to establish the fourth element—that the alleged harassment was sufficiently pervasive or severe to alter the terms, conditions, or privileges of her employment. Doc. No. 29, p. 21–22. Dr. Nazinitsky provides no response. *See* Doc. No. 39. Therefore, while "[i]t is important to recognize that 'the severity and pervasiveness evaluation is particularly unsuited for summary judgment,'" *see Lounds*, 812 F.3d at 1222 (internal citations and quotation marks omitted), because Dr. Nazinitsky has failed to respond at all to Integris's probative arguments and evidence, she fails to carry her prima facie burden under *McDonnell*. Integris is therefore entitled to summary judgment.

---

[9] Dr. Nazinitsky does not appear to argue that her other grievances—Integris's alleged failure to provide administrative support, and to pay two months of cell phone bills, in addition to excessive on-call requirements, weekend work, and spotty lab service—forced her to quit. Even if she did, her claim would still be subject to dismissal. There is no evidence demonstrating that such actions were discriminatory, and as mentioned previously, "an employee cannot survive summary judgment merely by producing evidence showing that working conditions were difficult or unpleasant." *Fischer*, 525 F.3d at 981 (citation omitted).

### d. Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Lounds*, 812 F.3d at 1233–34.

Integris contends that Dr. Nazinitsky fails to establish element two—that a reasonable employee would have found the challenged action materially adverse. In doing so, Integris asserts that Dr. Nazinitsky fails to show she suffered an adverse employment action as it has been defined by the Court in addressing Plaintiff's anti-discrimination claim. Doc. No. 29, p. 22. Dr. Nazinitsky agrees that the common "adverse employment action" standard is appropriate but argues that she meets it. Doc. No. 39, p. 29.

Upon review of the relevant law, both parties have applied the wrong standard in briefing their arguments to the Court. They each overlook *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006), where the Supreme Court modified the standard for the second element of the prima facie requirement for retaliation claims under Title VII.[10] "No longer must a plaintiff prove that subsequent 'adverse employment action' was taken against her, as that phrase has been construed in Title VII discrimination cases. Rather the plaintiff must show that a reasonable employee would have found the action materially

---

[10] Though each party cites a post-*Burlington* case and mentions some version of the appropriate standard in their rule statements, their actual arguments on this issue merely reference their "adverse employment action" discussion in their Title VII anti-discrimination sections. *See* Doc. No. 29, p. 23 (referencing anti-discrimination section to make "adverse employment" argument for retaliation claim); Doc. No. 39, p. 29 (same).

adverse such that they might be dissuaded from making a charge of discrimination." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008) (citing *Burlington Northern & Santa Fe Ry. V. White*, 548 U.S. 53 (2006)). For conduct to be materially adverse, it must have produced an injury or harm, but unlike in Title VII discrimination cases, the injury or harm in a retaliation claim need not be employment related. *Id.* at 1212.

In her Complaint, Dr. Nazinitsky alleges that she was subjected to harassment and a hostile work environment based on her sex, in part because she was not provided adequate support staff. Doc. No. 1, ¶ 13. She also argues in her brief that she was denied cell phone reimbursements, experienced excessive on-call requirements, and was not paid for working weekends. Doc. No. 39, p. 34. She asserts that she reported and complained about this mistreatment constantly and that as a result she suffered retaliation in the form of false accusations of inappropriate conduct. Doc. No. 1, ¶¶ 14, 15. It appears then, that the "materially adverse action" Dr. Nazinitsky complains of is the meeting between her and her superiors to discuss the three anonymous reports made against her, and the subsequent warning memo.[11]

Accordingly, to satisfy her initial burden, Dr. Nazinitsky must demonstrate how the meeting and subsequent warning was materially adverse. In short, Dr. Nazinitsky has failed to satisfy this burden. As noted above, she fails to argue that Integris's conduct meets the relevant standard as pronounced in *Burlington*.

---

[11] Dr. Nazinitsky suggests that Integris's retaliation also included her lack of support staff, non-payment of cell phone bills, excessive on-call requirements, and non-payment for working weekends. *See* Doc. No. 39, p. 34. As Defendant points out, however, *see* Doc. No. 46, p. 10, those actions would, if anything, be evidence of the alleged discrimination that she initially opposed, not evidence of Integris's retaliatory action.

Even if she argued the relevant standard and satisfied her initial burden of proving a prima facie case of retaliation under Title VII, her claim is still deficient. She fails to present convincing evidence to show that Integris's proffered rationale for the alleged retaliatory conduct was pretextual. *See Lounds*, 812 F.3d at 1236 n.9 (assuming without deciding that plaintiff had established the prima-facie-case component of her claim but dismissing her claim because she failed to present convincing evidence of pretext).

"Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to the defendant[-employer] to come forward with a legitimate, . . . non-retaliatory rationale for the [materially adverse action]. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Id.* at 1234 (citation and internal quotation marks omitted). "Pretext can be inferred from evidence revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation . . . ." *Id.* (quoting *Macon v. United Parcel Serv., Inc.,* 743 F.3d 708, 714 (10th Cir. 2014)). Additionally, it can be alleged "by showing that the plaintiff was treated differently from others similarly situated." *Id.* (quoting *Jaramillo v. Adams Cty. Sch. Dist. 14,* 680 F.3d 1267, 1269 (10th Cir. 2012)). The critical question here is whether "a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted [non-retaliatory] reasons." *Id.* (quoting *Crowe v. ADT Sec. Servs., Inc.,* 649 F.3d 1189, 1196 (10th Cir. 2011)). Therefore, "mere conjecture that the defendant-employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."

*Jackson v. Educ. & Employment Ministry*, 686 F. App'x 577, 580 (10th Cir. 2017) (citation omitted).

Here, Integris asserts that the reason Dr. Nazinitsky was called into a meeting and asked to sign a warning memo, was because it received three separate complaints alleging that she had created a hostile work environment and had spoken to staff disrespectfully. Doc. No. 29, p. 23; Doc. Nos. 29-9, 29-10, 29-11. The Court views Integris's proffer as a legitimate, non-retaliatory rationale for adverse action. *See Lounds*, 812 F.3d at (finding defendant's proffer that plaintiff was excessively absent to be a legitimate, non-retaliatory rationale for an employer's action).

In response, Dr. Nazinitsky argues that Integris's rationale is false, as evidenced by the statements of her mentor and Medical Director for the Integris Transplant Institute, Dr. Long. Doc. No. 39, p. 27–28. She states that Dr. Long described himself as "proud to have [Dr. Nazinitsky] as part of our team because of the professional work that she did." *Id.* (citing Long. Dep., Exh. No. 7, 12:21). First, the statement Dr. Nazinitsky cites is not found in the excerpt of Dr. Long's deposition provided to the Court. Second, assuming such a statement was made by Dr. Long, it does not create a genuine issue of material fact as to whether Integris's actions were pretextual. That Dr. Long may have thought Dr. Nazinitsky did professional work, does not cast doubt upon Integris's proffer that the meeting and subsequent warning resulted from complaints filed against Dr. Nazinitsky.

Dr. Nazinitsky also asserts that pretext can be inferred because she was treated differently than her male counterparts when it came to violations of work rules of comparable seriousness. Doc. No. 39, p. 28. But the evidence she provides is mere

conjecture. *See, e.g.,* Doc. No. 39-2, 198:3–7 ("no male physician to my knowledge, would have ever been accused of saying the F word and having a meeting with the president of the hospital and a vice president of NZTI because of an anonymous report of saying the F word"). Accordingly, her argument is an insufficient basis for denial of Integris's summary judgment motion, *see Jackson*, 686 F. App'x at 580. What's more, Dr. Nazinitsky admits that "the reports to the Integrity Line are discussed with the physician or staff member who is mentioned in the report regardless of the person's gender." Doc. No. 39, ¶ 31; Doc. No. 29, ¶ 31. Consistent with the above, Dr. Long opines that Integris's alleged retaliatory actions would have taken place if "anyone" were to have been accused of the "abusive behavior" that Dr. Nazinitsky was accused of. Doc. No. 29, p. 30:5–17.

Dr. Nazinitsky has failed to present convincing evidence that Integris's legitimate, non-retaliatory rationale for calling a meeting with her, and subsequently providing her with a warning was mere pretext meant to conceal a discriminatory motive. The Court finds no genuine dispute of material fact regarding the resolution of Dr. Nazinitsky's retaliation claim. Integris is therefore entitled to summary judgment.

## V.    Conclusion

For the foregoing reasons, the Court grants the Motion for Summary Judgment, Doc. No. 29, filed by Defendant Integris Baptist Medical Center.

**IT IS SO ORDERED** this 23rd day of April 2020.

David L. Russell

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**